IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FREDDY C. WARNER, JR.,

        Plaintiff,

v.                                                                                      Civil Action No. 1:14-cv-113

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

On June 26, 2014, Plaintiff Freddy C. Warner, Jr. ("Warner" or "Plaintiff") filed this action for judicial review of an adverse decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. ECF No. 1. The Commissioner filed her answer on December 15, 2014. ECF No. 10. The Plaintiff then filed his motion for summary judgment on January 14, 2015. ECF No. 13. The Commissioner filed her motion for summary judgment on February 12, 2015. ECF No. 15. On February 26, 2015, the Plaintiff filed a response to the Commissioner's motion. ECF No. 17. For the reasons that follow, I recommend that this matter be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

### II. FACTS

**A. Procedural History**

Warner applied for DIB on September 6, 2011, and SSI on September 21, 2011. R. 242-48; 249-55. In both claims, he alleged a disability beginning on June 21, 2011. R. 242, 249. Warner's

claims were initially denied on November 16, 2011, and upon reconsideration on December 27, 2011. R. 171-86; 187-200. Warner requested a hearing before an Administrative Law Judge ("ALJ"), and, on March 7, 2013, an ALJ hearing was held before ALJ Karen B. Kostol in Morgantown, West Virginia. R. 201-02; 81-141. Warner, represented by counsel, testified at the hearing as did a vocational expert ("VE"). R. 81-141. In a written decision, ALJ Kostol found that Warner "ha[d] not been under a disability, as defined in the Social Security Act, from June 21, 2011, through the date of" the decision. R. 17-31. Warner appealed the ALJ's decision to the Appeals Council, which denied review on May 5, 2014. R. 1-3. Warner then timely brought his claim to this Court.

**B. Medical History**

The following medical history is relevant to Warner's challenges to the ALJ's decision.

<u>1. Educational History</u>

Beginning in 1978, Warner attended North Elementary School in Randolph County, West Virginia. R. 312. During first grade, Warner received mostly failing grades. *Id.* Based on the dates of attendance, it appears that Warner repeated at least one elementary grade. *Id.* From 1980 to 1985, Warner was placed in special education and did not take any achievement tests. *Id.* From seventh through ninth grade, the record reveals a number of A, B, and C grades, as well as some D and F grades. R. 313. During the ALJ hearing, Warner testified that he dropped out of high school in 11th grade. R. 94.

<u>2. March 12, 2010, "Adult Mental Profile"</u>

On March 12, 2010, Sharon Joseph, Ph.D, completed an "Adult Mental Profile" of Warner. R. 413-18. The profile notes that Warner stated he "was treated from May 5, 1994, to December 1,

2

1994, for behavior problems." R. 414. However Warner denied "ever having been hospitalized for emotion or psychological problems" or visiting "a psychiatrist or taking any medication for psychological problems. *Id.*

A WAIS-IV intellectual assessment revealed a full scale IQ score of 65, which "falls in the mild mentally impaired range." R. 415. However, Dr. Joseph reported that "based on the problems with internal validity and apparent external validity, the results cannot be considered valid." R. 416. Dr. Joseph explained that "[t]he psychometrician felt that [Warner's] effort was questionable. He reported he had some difficulty with vision secondary to diabetes, but had not been to the doctor and also reported his hearing was bad due to working around heavy machinery." R. 415. It was also reported that Warner "gave up easily on the verbal sections of the test." R. 415-16. Further, Dr. Joseph questioned the IQ test's "external validity" because it conflicted with his work history. R. 416. Although Warner's educational records were not made available for Dr. Joseph to review, she nevertheless concluded that Warner did "not seem to be consistent with [a] Full Scale IQ score of 65." *Id.*

Dr. Joseph's profile further noted that Warner denied any suicidal thoughts or depressive symptoms. R. 416. Warner reported that he makes his bed, uses a vacuum, washes dishes, dusts, cooks, stores groceries, mows the yard, takes out the garbage, shovels the sidewalk, and drives a truck. R. 417. Dr. Joseph found Warner's socialization "to be within normal limits." *Id.* Lastly, Dr. Warner concluded that Warner had borderline intellectual functioning, but noted that "[e]ducational records should be obtained." *Id.*

3. March 7, 2011, Psychological Evaluation

On March 7, 2011, Warner was again evaluated by Dr. Joseph. R. 323-29. In the evaluation,

3

Dr. Joseph summarized her previous evaluation, including her belief that Warner's "intellectually functioning probably falls within the Borderline Range." R. 325. Dr. Joseph administered a MCMI-III "in order to provide some data in regards to personality functioning." *Id.* Dr. Joseph noted that the test was "read to [Warner] due to the fact that his reading level was 4.9 grade equivalent, and an eighth grade reading level is required." *Id.* The test revealed major depression and anxiety as well as borderline personality pattern. *Id.* However, Dr. Joseph cautioned that based on Warner's "response style," the results "may be somewhat exaggerated . . . ." *Id.* She assigned Warner a GAF score of 58. *Id.* Dr. Joseph again concluded Warner had borderline intellectual functioning as well as depressive disorder and moderate psychological stressors. *Id.*

4. September 14, 2011, Psychological Evaluation

On September 14, 2011, Warner was evaluated by Rodney McCullough, MA, on behalf of Warner's counsel. R. 339-43. McCullough stated that his report was completed by reviewing the medical record and conducting a "cooperative" evaluation of Warner. R. 339. McCullough's evaluation noted that Warner "has never been hospitalized for mental health reasons" and was "not receiving any mental health intervention." R. 340. McCullough remarked that Warner's "immediate memory was within normal limits" but "his delayed memory was significantly impaired . . . ." R. 341. Testing revealed "mild impairment in attention and concentration." *Id.* Testing also revealed a full scale IQ score a 70, which placed "him within the borderline range of capabilities." R. 342. MuCullough stated that "[t]his is considered to be a valid and reliable assessment of [Warner's] intellectual functioning" and "[a]ll test scores . . . suggested mild to moderate impairment in cognitive functioning." *Id.* McCullough concluded that Warner functioned "in the borderline [] range of intellectual capabilities" and there was "no indication of a learning disorder" or "a

4

significant emotional or behavioral disorder" R. 342-43.

5. November 4, 2011, Psychiatric Review and Mental Assessment

On November 4, 2011, a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment ("Mental RFC") were completed by Bob Marinelli, Ed.D. R. 346-62. Dr. Marinelli determined that Warner suffered from depressive disorder not otherwise specified. R. 349. Dr. Marinelli concluded that Warner was moderately limited in his activities of daily living and maintaining concentration, persistence, or pace. R. 356. In the Mental RFC, Dr. Marinelli found that Warner "is reduced by moderate limitations in memory, concentration, sustained persistence [and] adapting to change. He has the capacity to sustain routine [and] gainful work-related activity involving short [and] simple instructions with low pressure [and] adaptive demands." R. 362.

6. Letters Sent to Warner's Counsel

In March 2013, Warner's step-father and ex-wife submitted letters to Warner's counsel. Warner's step-father stated that Warner has "problems comprehending things he reads" and "does not do very well with math." R. 314. Warner's step-father contended that Warner cannot "handle a checkbook . . . or pay bills by himself." *Id.* He also claims that Warner is unable to "plan a week's worth of meals and buy that food within a budget." *Id.* Warner's ex-wife stated that Warner "has always required significant help with his personal affairs." R. 421. She contended that Warner struggles with writing and reading comprehension. *Id.* She claims that Warner is unable to handle money and doubts Warner "could manage his personal affairs if he was completely on his own." *Id.*

**C. Testimonial Evidence**

Testimony was taken at the ALJ hearing held on March 7, 2013. R. 81-141. The following portions of the testimony are relevant to the disposition of this case.

1. Warner's Testimony

Warner testified that he lived with his step-father. R. 93. He has a driver's license and stated that he drives "some." *Id*. Warner stated that he failed first grade and attended several special education courses. R. 94. He claimed that he can read "[t]o a certain extent" but has difficulty spelling. R. 94-96. Warner testified that he had some vocational training on small engines in high school. R. 97.

From 2006 to 2008, Warner for a lumber company. R. 98-99. Warner stated that he lifted, at most, fifteen pounds, and "[h]ad to climb a lot." R. 100. Warner testified that he was laid off after the company closed. R. 99. Before working for the lumber company, Warner stated that he worked for a logging company. R. 101. Warner stated that he only worked at the lumber company for two or three months. *Id.* After leaving the logging company, Warner testified that he represented himself before the labor board. R. 102. Warner also briefly worked at another logging company before being terminated for "inadequate production." R. 103.

Warner stated that he suffers from diabetes, experiences lung issues, and has difficulty hearing. R. 116-18. Warner testified that he has had problems with memory, reading, and writing. R. 118-19. He stated that his step-father takes care of the checkbook and bills. R. 119. When Warner was married, he stated that his wife took care of bills, insurance, and banking. *Id.* Since becoming a diabetic, Warner claimed that he experiences numbness in his fingers and his condition has progressively gotten worse. R. 129.

2. The VE's Testimony

A VE also testified at the hearing. The ALJ gave the VE the following hypothetical:

assume an individual with the same age, education, and past work experience as the claimant with the following abilities: said individual is capable of light exertional

6

level work; can never climb ladders, ropes, or scaffolds; can occasionally perform all other postural activities; said individual must avoid concentrated exposure to extreme cold . . . extreme heat, excessive vibration, and hazards such as dangerous moving machinery and unprotected heights; and must have a sit/stand option; said individual is limited to work that's is simple, routine, and repetitive, and is capable of work in a low stress job defined as having only occasional decision making required, occasional changes in the work setting, and no strict production quotas; can an individual with these limitations perform the claimant's past work?

R. 132-33. The VE stated that the hypothetical individual could not perform Warner's past work. R. 133. With a option to sit or stand up for ten minutes every hour, the VE testified that the a person with limitations described by the ALJ could perform work at the light and sedentary levels. R. 133-34. The VE also stated that if an employee if off task more than ten percent, it would "completely eliminate a competitive work routine at any level . . . ." R. 135.

### III. ALJ FINDINGS

In determining whether Warner was disabled, the ALJ followed the five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520, 416.920. The first step in the process is determining whether a claimant is currently engaged in substantial gainful activity. §§ 404.1520(b), 416.920(b). If the claimant is not engaging in substantial gainful activity, then the second step requires the ALJ to determine whether the claimant has a medically determinable impairment that is severe or a combination of impairments that are severe. §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment or combination of impairments, then the analysis moves to the third step in the sequence, which requires the ALJ to determine whether the claimant's impairments or combination of impairments meets or equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). §§ 404.1520(d), 416.920(d). If an impairment meets or equals a listed impairment, the claimant is disabled. *Id.* However, if the impairment does not meet or equal a listed impairment, the ALJ must determine the claimant's residual functional capacity

7

("RFC"), which is the claimant's ability to do physical and mental work activities on a sustained basis despite the limitations of his impairments. §§ 404.1520(e), 416.920(e). After determining the claimant's RFC, the ALJ must determine, at step four, whether the claimant has the RFC to perform the requirements of his past relevant work. §§ 404.1520(f), 416.920(f). If the claimant does not have the RFC to do his past relevant work, then he has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, at the final step in the process, that other work exists in significant numbers in the national economy that the claimant can do, given the claimant's RFC, age, education, and work experiences. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir.1983).

Here, as a preliminary matter, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013. R. 22. Then, at step one of the sequential process, the ALJ found that Plaintiff had "not engaged in substantial gainful activity since June 21, 2011, the alleged onset date." *Id.* At step two, the ALJ found that Plaintiff had "the following severe impairments: type II diabetes mellitus; hypertension; knee internal derangement and possible medial meniscus tear; AC joint arthritis; lumbar spine condition; obesity; and borderline intellectual functioning." R. 23. However, at the third step, the ALJ found that none of Plaintiff's impairments met or medically equaled the severity of any of the of impairments contained in the Listings, including Listing 12.05. R. 23. "With regard to listing 12.05," the ALJ concluded that Warner had not "evidenced 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period . . . as is required by the threshold language of" the Listing. R. 24. Therefore, because the ALJ found that Warner did not meet or equal a listed impairment, the ALJ determined Warner had the following

RFC:

> to perform light work . . . except with the following limitations: can never climb ladders, ropes or scaffolds, can occasionally climb ramps or stairs, balance, stoop, crouch, kneel or crawl; must be afforded the opportunity to alternate positions from standing and/or walking to sitting for up to 10 minutes every hour; must avoid concentrated exposure to extreme cold, extreme heat, excessive vibration and hazards such as dangerous moving machinery and unprotected heights; work limited to simple, routine and repetitive tasks; and capable of work in a low stress job, defined as having only occasional decision making required, occasional changes in the work setting and no strict production quotas.

*Id.* At step four, the ALJ found that Warner "was unable to perform any past relevant work." R. 30. Yet, at the final step, the ALJ concluded that "[c]onsidering [Warner's] age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that [Warner] can perform." R. 30. Thus, the ALJ ruled that Warner had "not been under a disability within the meaning of the Social Security Act from June 21, 2011, through the date of" the ALJ's April 2013 decision. R. 21.

## IV. MOTIONS FOR SUMMARY JUDGMENT

### A. Contentions of the Parties

In his motion for summary judgment, Warner contends that the ALJ's decision was not supported by substantial evidence. First, Warner argues that the ALJ based her decision "on an error of law" because "she failed to find [the Plaintff's] condition met the requirement of Listing 12.05(C)." ECF No. 14 at 6. Warner claims that he has met all three prongs required to satisfy the Listing. Second, Warner alleges that ALJ erred "because she relied on information not part of the record." *Id.* at 10. According to Warner, the ALJ cited a report and prior testimony that were not made a part of the hearing record.

The Commissioner argues that substantial evidence supports the ALJ's decision that

9

Warner's "impairments did not meet or equal Listing 12.05C." ECF No. 16 at 6. The Commissioner notes that the ALJ's decision referenced an earlier ALJ decision also denying Warner's past disability claims and concluded that Warner had since failed to "prove any worsening of his intellectual functioning." *Id.* The Commissioner also argues that the ALJ's use of a report not in the record was cited during the ALJ hearing included in the administrative transcript. The Commissioner contends that, at most, the ALJ's use of the report was harmless error.

**B. The Standards**

1. Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

2. Judicial Review

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v.*

*Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 664-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

**C. Discussion**

Listing 12.05C

As stated previously, an ALJ follows a five-step sequential evaluation process to determine whether a claimant is disabled. See 20 C.F.R. §§ 404.1520, 416.920. "At the third step, [an ALJ] considers the medical severity of [a claimant's] impairment." §§ 404.1520(A)(4)(iii), 416.920(A)(4)(iii). If a claimant has an "impairment(s) that meets or equals one of [the] listings in appendix 1 to subpart P of part 404 . . . and meets the duration requirement, [an ALJ] will find that [a claimant is] disabled." § 416.920(A)(4)(iii). The 12.00 series of the listings concern mental disorders and "are arranged in nine diagnostic categories . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).

Warner argues that the ALJ erred by concluding that his level of cognitive functioning did not meet or equal Listing 12.05C, one of the listed impairments for intellectual disability. Listing 12.05C requires a showing of "deficits in adaptive functioning initially manifested during the

11

developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." ("Prong 1") § 12.00. Listing 12.05C additionally requires "[a] valid verbal, performance, or full scale IQ of 60 through 70" ("Prong 2"), as well as "a physical or other mental impairment imposing an additional and significant work-related limitation of function." ("Prong 3") § 12.05.

"Deficits of adaptive functioning," as required to satisfy Prong 1, may include a wide variety of limitations, including "limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia*, 536 U.S. 304, 309 n. 3 (2002)). Additionally, "though the Listing requires 'deficits' in adaptive functioning, it does not specify what degree of deficit is required (mild versus significant, for example), whether deficits must exist in one, two, or more categories of adaptive functioning, or what methodology should be used to measure deficits in adaptive functioning." *Blancas v. Astrue*, 690 F. Supp. 2d 464, 477 (W.D. Tex. 2010) (citing *Barnes v. Barnhart*, 116 Fed.Appx. 934, 939 (10th Cir.2004)).

In the ALJ's decision, she concluded, "[w]ith regard to listing 12.05," Warner had not "evidenced 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period' (i.e., prior to the age of 22) as is required by the threshold language of that listing in order to implicate any further evaluation under its provisions." R. 24. Thus, because the ALJ concluded that Warner did not satisfy Prong 1 of any 12.00 listing, the ALJ did not address Prongs 2 and 3 of Listing 12.05C. In reaching this decision, the ALJ explained as follows:

> The record contains transcripts from Randolph County Public Schools which indicate the claimant did not take any achievement tests from 1980 to 1985 due to being in

12

special education. While these records are indicative that the claimant was in special education, they do not demonstrate that the claimant has evidenced significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period. The undersigned finds that the foregoing evidence as to the claimant's demonstrated abilities in adolescence clearly indicate an inherent level of intellectual functioning that falls within the low average or borderline range, as opposed to any clear or obvious "listing-level" mental retardation. In view of the foregoing circumstances and evidence, the undersigned concludes that no further evaluation of the claimant's mental status in conjunction with the A through D provisions of listing 12.05 Mental Retardation is warranted.

R. 24 (internal citations omitted).

The ALJ's finding that Warner failed to demonstrate "deficits in adaptive functioning" necessary to satisfy Prong 1 of Listing 12.05C appears to be solely based on the ALJ's conclusory finding that Warner's educational background shows "low average or borderline range" functioning but not "'listing-level' mental retardation." *Id*. In reaching this conclusion, the ALJ fails to discuss what facts in the record provide for this distinction. Although substantial evidence may ultimately support the ALJ's finding, many other facts raised by Warner suggest actual deficits in adaptive functioning prior to age 22. In his motion, Warner cites evidence that he failed many subjects in school, repeated grades, scored very low on a reading test, and did not complete high school. ECF No. 14 at 8, R. 312-13. This evidence is further strengthened by later reports that Warner's MCMI-III test administered in March 2011 had to be read to him because his reading level was at the 4.9 grade level. R. 325. Thus, without further elaboration by the ALJ as to why Warner's educational background demonstrates "borderline range" functioning but not "'listing-level mental retardation,'" it is simply impossible to tell whether there was substantial evidence to support the" ALJ's determination that Warner did not satisfy Prong 1 of Listing 12.05C. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986); *see also Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir.1987) (remand is appropriate where an ALJ fails to discuss relevant evidence that weighs against her

decision).

Further, although not addressed by the ALJ, it appears that Warner may also satisfy Prongs 2 and 3 of Listing 12.05C. As to Prong 3, the ALJ found that Warner suffers from multiple severe impairments, including type II diabetes, knee internal derangement and possible medial meniscus tear, AC joint arthritis, lumbar spinal condition, and obesity. R. 23. As to Prong 2, a September 2011 evaluation by Rodney McCullough, MA, revealed Warner had a full scale IQ of 70-falling within the 60-70 IQ range required by Prong 2. R. 342. Additionally, McCullough noted that the IQ score was "valid and [a] reliable assessment of [Warner's] level of intellectual functioning." *Id.*; *see Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012) (criticizing an IQ test result that did not include a statement "to the validity of the test results" or an opinion that the test taker gave his best efforts). However, "an ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it" due to possible conflicting evidence in the record. *Hancock*, 667 F.3d at 474. Thus, the determination as whether Warner's satisfies Prongs 2 and 3 of Listing 12.05C will be left to the discretion of the ALJ on remand.

2. Evidence Not Part of the Record

In the ALJ's decision, she noted several instances that "detract[ed] from the credibility of [Warner's] allegations concerning the severity of his symptoms." R. 28. In doing so, Warner argues that the ALJ cited and relied on two pieces of evidence that were not part of the record: (1) a function report from a prior case that indicated Warner could "count money, handle a checking account and pay bills;" and (2) testimony from a prior ALJ hearing revealing that Warner had only known his wife, "Alyssa," for roughly four months prior to the hearing. ECF No. 14 at 11; R. 28. The Commissioner appears to concede that the function report from a prior ALJ hearing is not in the

14

current record, but argues that the ALJ's reliance on the report in her decision was nonetheless "harmless error." ECF No. 16 at 10.

To be included in the record, "exhibits must be selected, arranged and marked in ALL Decision cases." HALLEX I-2-1-20, 1993 WL 642969, at *1 (Sept. 28, 2005) (capitalization in original). It is improper for an ALJ to consider evidence outside the record. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997). However, the error is harmless if the extra-record evidence was incidental to the ALJ's decision. *Id.*

In this case, the ALJ's cite of a function report that found that Warner could "count money, handle a checking account and pay bills" is not present in the current record. R. 28, 32-33. The ALJ cites this report as "Exhibit B1A." However, Exhibit B1A is an August 2011 denial of Warner's request for the Appeals Council to review a prior ALJ decision. R. 142. Additionally, testimony from a prior hearing used by the ALJ in this case was not cited as an exhibit her decision. R. 32-35. Although the consideration of the evidence was improper, any error as to the inclusion of the evidence was harmless. Even without the inclusion of the function report and prior testimony, substantial evidence supports the ALJ's credibility determination.

The record illustrates that the ALJ evaluated Warner's credibility and subjective statements of pain and symptoms in accordance with the two-part test established in *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996), and the factors outlined in 20 C.F.R. 404.1529 and SSR 96-7p. First, the ALJ found that Warner's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ." R. 27. Next, in accordance with the factors set out in 20 C.F.R. 404.1529 and SSR 96-7p, the ALJ considered whether Warner's subjective statements regarding his symptoms were substantiated by, or conflicted with, the objective evidence in the record, and found

15

that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.* For example, the ALJ noted that Warner "admitted that he has no problems with his personal care such as dressing, bathing, caring for his hair, shaving, feeding himself or using the toilet." R. 28. Additionally, the ALJ discussed that "[a] review of the claimant's work history shows that the claimant has a very weak work history, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments." R. 27-28. Further, the ALJ also found that Warner's "treatment records fail to support the allegations that the claimant is a totally disabled individual." R. 27. The ALJ noted that Warner has discontinued taking his diabetes medicine and testified that he does not track his blood sugar. *Id*. Thus, because the ALJ's credibility determination is supported by substantial evidence even without the extra-record evidence, the error is harmless.

## V. RECOMMENDATION

For the reasons appearing above, the undersigned recommends the Plaintiff's motion for summary judgment, ECF No. 13, be **GRANTED IN PART AND DENIED IN PART** and the Commissioner's motion for summary judgment, ECF No. 15, be **DENIED** and this case be remanded to the ALJ for the limited purpose of a complete discussion as to whether the Plaintiff's impairments meet the requirements of Listing 12.05C.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and

Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

DATED: August 5, 2015 /s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE